IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

United States of America

v.                                                    Criminal No. 14-150

Owen Moore

## OWEN MOORE'S SENTENCING MEMORANDUM

### I. PRELIMINARY STATEMENT

Owen Moore does not seek to minimize or excuse his conduct. At the
sentencing hearing, he will make a statement accepting responsibility,
acknowledging his wrongdoing, and expressing sincere regret. While Mr. Moore
accepts responsibility for his actions, it is important for this Court to understand
that he was not motivated solely by greed.

Mr. Moore was born in 1963 in Owens Grove, Liberia. In 1984, at the age of
20, Mr. Moore emigrated from Liberia to the United States. He began humbly, living
in Harlem in New York City and working in a dye factory. He was able to advance
himself eventually earning a solid income within several corporations, including
Siemens Corporation. Throughout his life in America, Mr. Moore supported both his
family in the United States and his family abroad. Mr. Moore achieved the highest
level of education and financial success in his family. As a result, he felt an obligation
to assist his family in their lives when they faced hardships. He contributed
significant financial support to his children, his siblings in America and Liberia, and
his parents. These obligations created a mounting financial pressure on Mr. Moore,

and, when combined with the heavy load of his two demanding positions with Siemens, lead to his participating in the actions described in the Indictment.

At sentencing, the defense will present some of the documentation related to the more than $100,000 in expenses Mr. Moore paid to assist or support family from 2008 through the middle of 2010. However, the defense will present enough evidence that this Court should consider Mr. Moore's significant support of his family as a contributing factor to his conduct. None of this justifies or excuses Mr. Moore's conduct but arguably it mitigates when compared to similar conduct motivated entirely by greed.

In addition, much of the problems in this case arise from Mr. Moore performing two full time job functions. He spent more than 25 years of his career, before this incident with Siemens, as a finance professional and had no diversity experience. Acting as the diversity director at Siemens was a job outside his area of expertise and resulted in long hours placing significant pressure on Mr. Moore.

## II. SENTENCING CALCULATION

The Defense disputes the Offense level contained in the Pre-Sentence Report. The Defense does not dispute Mr. Moore's Criminal History Category of I.

In the PSR, the base offense level is listed as 7. The defense does not dispute this number. For specific offense characteristics, related to the monetary amount at issue, the report lists a 12-point increase in Offense level because of the $306,031.12 taken from Siemens. While the defense does not dispute the hard numbers calculated in this section, the defense does dispute the actual economic value of the loss. Specifically, it is the contention of the defense that Siemens did receive a

portion of the value of the money taken in the form of services performed by Mr. Moore. The defense will address this issue in greater detail below.

The PSR also suggests a two-point increase in Offense level for "sophisticated means." The type of behavior described in the PSR is not the "sophisticated means" contemplated by that section of the sentencing guidelines, which is meant to encompass more sophisticated fraud schemes. The defense will also address this issue in greater detail below. Based on the above the defense would be seeking a Total Offense Level of 16 and would argue for mitigation based on relevant issues to the defendant that will be discussed in greater detail below and addressed at sentencing.

### This Court should credit against the loss claimed by the Government the fair market value of diversity services received by Siemens from Owen Moore.

U.S.S.G. § 2B1.1 describes the loss amounts that will trigger increases in the Offense level score. In this particular case, the Government has alleged a loss of $306,031.12. The Government has calculated this number based on the actual loss to Siemens, or money paid to Benchmark Solutions, of $263,739.84 plus an additional $42,291.28 for "personal" expenses incurred by Mr. Moore and paid by Siemens - this number primarily includes money paid towards his MBA from Eastern University and money paid toward the ODCAA, a charitable organization Mr. Moore assisted. This $306,031.12 loss initially requires an addition of 12 points to the base offense level of 7 for the loss paid by Siemens. This figure includes $0 of credit toward the loss. The commentary to § 2B1.1 includes a section in 3 (E) that states "[l]oss shall be reduced by the following: (i) The money returned, and the fair market value of the property returned and the **services rendered**, by the defendant

or other persons acting jointly with the defendant, to the victim before the loss was detected." (emphasis added). Therefore, the Guidelines require credit toward the loss when the victim in the scheme, here Siemens, receives something of value in return to offset the loss. This scenario appears most commonly where a defendant has fraudulently obtained a loan and the lender recovers some of the loss through obtaining title to collateral. See, e.g., United States v. Sharma, 190 F.3d 220 (3d Cir. 1999) (holding that the District Court's failure to credit property worth $80,000 against the loss, when it only credited $40,000 against the loss, was error but harmless because it did not change the guideline category).

Here, Mr. Moore was appointed to be the diversity director at Siemens. It is the defense position that Siemens created the diversity program, in part, to allow Siemens to bid for Government contracts that require certain minimum percentage representations of individuals in various racial and ethnic categories. Siemens placed Mr. Moore in this position with the idea that the program would help to increase the firm's minority representation, and therefore, allow for bidding of certain lucrative government contracts. The defense contends that some of these contracts were worth more than $100 million to Siemens in revenue. Mr. Moore took this position without any increase in his compensation, effectively performing two full-time positions for no additional salary. Siemens, therefore, received the benefit of Mr. Moore's efforts and was not paying for it as part of his customary salary. Of course, Mr. Moore received compensation for his efforts by the fraudulent payments made to Benchmark Solutions, but the Government's present calculation gives no value to the services that Mr. Moore performed for Siemens. The defense

will present evidence at sentencing that these services included: organizing

meetings at various Siemens job sites to discuss diversity initiatives, coordinating

recruiting efforts to increase diversity in the Siemens workforce, attending

conferences on behalf of Siemens where diversity concerns were discussed, and

raising awareness about diversity related issues within the company. Mr. Moore

performed all of these services before Siemens discovered the fraud. Therefore, the

defense requests a credit towards the services Mr. Moore rendered against the

losses required by the sentencing guidelines.

In order for this Court to credit some of Mr. Moore's uncompensated

activities as the diversity director toward the loss in the Indictment, the Court must

determine a value for the loss. Although it is difficult to quantify the contributions

without Mr. Moore earning a salary, the defense would propose evaluating the hours

put in by Mr. Moore and the market value of a diversity director working those

hours. Mr. Moore worked both as a full time employee in the finance department

and as a full time diversity director at approximately 35 hours per week per job title.

The defense would argue that a fair estimate for the value of a full time diversity

director with no prior diversity experience would be $74,198.00 per year[1]. That

annual salary translates to a monthly salary of $6,183.66 per month. Mr. Moore

served as the diversity director for 28 months. Therefore, a fair estimate of the cost

of a full time employee in diversity, for that period of time, would be $173,128.66.

---

[1] See Exhibit A Diversity Manager Salary from payscale.com. Payscale.com compiles
salary data from employee surveys. This survey includes reports from 230
individuals reporting their job title as Diversity Manager. The salary ranged from
$50,594 to $114,705 with a median salary of $74,198. The data showing median
salary by years of experience suggests that an entry-level diversity manager earns
slightly less than the median of $74,198. The median salary is likely a fair estimate.

The defense would request that the Court credit this amount against the $306,031.12 in claimed loss and adjust the loss to $132,902.45. This credit would reduce the point increase for loss from 12 points to 10 points.

### The conduct contained in the Indictment does not amount to "sophisticated means" warranting the 2 level enhancement.

The PSR also states, and the Government advocates for, a two-point increase for use of sophisticated means under U.S.S.G. § 2B1.1 (b)(1)(G). This section of the sentencing guidelines says to add 2 points to the Adjusted Offense level "[i]f (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means, increase by 2 levels." The first two subsections of this portion of the Guidelines prescribe a 2 level enhancement when the fraudulent scheme involves a highly sophisticated international component to avoid detection. When the Third Circuit has upheld the sophisticated means enhancement, the defendants have employed highly complex money laundering schemes or complicated structures of shell corporations and straw purchasers to hide the fraud and the identity of the thief. See, e.g., United States v. Parker, 468 Fed. Appx. 183 (3d Cir. 2012) (upholding finding of sophisticated means where defendant used series of straw purchasers and shell corporations); United States v. Cianci, 154 F.3d 106 (3d Cir. 1998) (finding sophisticated means appropriate where the defendant used a shell corporation and fraudulent documents to conceal the fraud); United States v. Jones, 332 Fed. Appx. 801 (3d Cir. 2009) (upholding finding of sophisticated means where defendant employed specialized, technical software in

counterfeit access device fraud scheme and a secret service agent testified that this was "the most extensive and technically advanced" operation he had ever seen). Further, the commentary on the sentencing guidelines implementation manual states "[f]or purposes of subsection (b)(10)(C), 'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."

In this case, there is nothing especially complex or intricate about this offense. The Government's position is that by submitting the vendor request form with names other than Owen Moore and Larry Moore this level of concealment rises to the level of "sophisticated means." However, this conduct certainly falls well short of the "most technically advanced" scheme a Secret Service agent had ever seen, and indeed is likely to be of a similar level of sophistication as any basic fraudulent scheme. It is a natural consequence of fraudulent conduct for some concealment to result. Minor, or ordinary, concealment, however, is not the same as the level of sophisticated concealment required to warrant the 2 level increase for "sophisticated means." Therefore, the defense opposes this enhancement.

### Conclusion

If the Court agrees with the defense on the loss valuation and that the sophisticated means enhancement is not warranted, then the offense level calculation would proceed as follows:

**Base offense level:**  7 as the offense of conviction carries a statutory maximum term of imprisonment of 20 years or more.

**Specific offense characteristics (loss):** add 10 points due to a loss of $132,902.45.

**Adjustment for Abuse of Position of trust:** add 2 points.

**Acceptance of responsibility:** subtract 2 points.

**(Early) Acceptance of responsibility:** subtract 1 point. Mr. Moore pled guilty two and a half months after his detention hearing and arraignment. He pled guilty before the Government had to litigate or respond to any pre-trial motions.

**Total Offense Level:** 16 (7 + 10 + 2 - 3)

**Guideline range:** 21-27 months

## IV. ANALYSIS OF SENTENCING FACTORS UNDER 18 U.S.C. §3553 (a)

Under United States v Booker, 543 U.S. 220, 245-46 (2005), the sentencing guidelines are no longer mandatory. The guideline range is merely one of a number of sentencing factors set forth in 18 U.S.C. 3553(a) that must be considered. A District Court's primary obligation is to choose a sentence in light of all the statutory factors in the context of a defendant's particular case. See Kimbrough v. United States, 128 S. Ct. 558 (2007); Gall v. United States, 128 S. Ct. 586 (2007). One of these factors is the history and characteristics of the defendant. Id.

It is not required that Mr. Moore be either unique or extraordinary in order to justify a variance below the sentencing guidelines range: "We reject...an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." See Gall, 128 S. Ct. at 595. The Kimbrough and Gall cases instruct the Court to consider Mr. Moore's particular history and circumstances. The Supreme Court stated in Kimbrough, "[t]he sentencing judge, on the other hand, has 'greater familiarity with . . . the individual case and the individual defendant before him than the Commission or the appeals court." Kimbrough, 128 S. Ct. at 574 (quoting United States v. Rita, 127 S. Ct. 2456, 2469

(2007) (recognizing the importance of an individualized determination of the appropriateness of a sentence)). The sentencing factors set forth in 18 U.S.C. §3553(a) include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

## 1. The nature and circumstances of the offense and the history and characteristics of the defendant

*a. The nature and circumstances of the offense*

The defense supplements the Government's representations of the nature and circumstances of the offense by noting that the fraud scheme encompassed by the Indictment does not involve any alleged physical violence or threats by Mr. Moore. While the fraud resulted in financial harm, it is not alleged to have resulted in physical violence. In addition, if this Court credits the entire $306,031.12 loss against Siemens, while the loss is significant and financially damaging, it is a relatively small amount when compared to Siemens' revenues and profits. For

instance, in the fiscal year 2009 Siemens Corporation earned $4.956 Billion[2] in net

income after taxes but before interest, and in Fiscal Year 2010 Siemens Corporation

earned $7.402 Billion in net income after taxes but before interest. See Exhibit B

Siemens Corporation Annual Report 2010. Thus, the loss the Government claims by

Mr. Moore over the course of approximately 28 months represents .0024% of

Siemens' net income over a representative 24-month period in 2009 and 2010[3].

While the sentencing guidelines themselves, in terms of calculating the adjusted

offense level, only take into account the pure numbers and do not consider the

impact on the victim, it would be the position of the defense that this conduct did

not substantially damage Siemens or create the risk of its going out of business. Mr.

Moore does not claim that this diminishes his responsibility but asks that the Court

consider it as a factor in determining the true severity of his actions and in

sentencing him.

*b. The history and characteristics of the defendant*

The defendant has no prior criminal history. He has a long history of

employment, including beginning in a lower skilled job and advancing through

higher ranks. Even after his arrest for this case, when he lost his job with Quest

Diagnostics, Mr. Moore did not give up and simply await his fate. He found new

---

[2] Siemens Corporation reports income numbers in Euros. Counsel has converted those numbers to dollars based on the IRS Yearly Average Currency Exchange Rates published at http://www.irs.gov/Individuals/International-Taxpayers/Yearly-Average-Currency-Exchange-Rates. Attached as Exhibit C.

[3] Counsel calculated this number by taking Siemens' net income from 2009 and adding it to the net income for 2010. The combined net income for those two periods was $12,358,000,000. This represents Siemens' income for the 24 months covering fiscal years 2009 and 2010. The fraud in this case occurred from February 2008 until May 2010. Attached as Exhibit B.

employment as a janitor. Mr. Moore has received an education and worked a job earning a six-figure salary for a corporation, and yet, he did not see working as a janitor as below him. He recognized his need to atone for his mistakes and chose to rebuild his life from the beginning. This determination shows his strong character and his low likeliness to reoffend.

By all indications, Mr. Moore has been a devoted family member to his siblings, his parents, and his children. He is also heavily involved in his church. His remorse has been profound and sincere since defense counsel first met him. At the sentencing hearing, the candor and depth of his remorse will be evident in his statement to the Court. Mr. Moore's remorse and self-rehabilitative conduct are also evident in Mr. Moore's cooperation since his arrest. This cooperation came early. Mr. Moore pled guilty early and accepted responsibility. He will not receive a sentencing departure motion by the Government simply because Mr. Moore, as one of two members in a limited conspiracy, had no information to provide the Government that the Government did not already know.

There is precedent for significant downward variance in white-collar cases where the defendant sincerely expresses remorse. United States v. Howe, 543 F.3d 128 (3d Cir. 2008). In Howe, a white-collar defendant defrauded the U.S. military of $150,000.00 and attempted to cover up his fraud by repeated deception over two years. Defendant Howe went to trial and was convicted. He then received a probationary sentence despite a sentencing guidelines range of 18 to 24 months' imprisonment. The Third Circuit validated the proper exercise of discretion by the District Court in Howe despite the District Court's view that the conduct was

extraordinarily serious based upon the District Court's articulation of relevant 3553 factors. In Howe, the Court very heavily relied on the defendant's remorse as an important factor, emphasizing that the remorse need not be extraordinary and that real remorse is frequently absent in white-collar matters. Id. at 138; see also, United States v. Tomko, 562 F.3d 558 (3d Cir. 2009) (holding that a sentence of probation was not an abuse of discretion when the guidelines called for 12-18 months in a $250,000.00 tax evasion case).

Therefore, for all of these reasons, the defense would seek a variance in this matter for a sentence below the guidelines.

## 2. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

As the defense has stated above, Mr. Moore has endured a significant professional punishment and embarrassment. His prior career is derailed with a huge loss of future income. Rather than allowing this punishment and embarrassment to keep him from leading a productive life, however, he has begun the rebuilding process by taking a job as a janitor. Losing his career is a substantial sanction, and while the defense recognizes it is not the only sanction that will result from this case, we request that the Court take this into account. The Court certainly can look to the impact of non-legal sanctions in determining an appropriate sentence.

The Government also has included money spent on a M.B.A. as part of the fraudulent conduct. While Mr. Moore recognizes the wrongfulness of his conduct and is willing to accept responsibility for it, the Defense would note here that

Siemens listed obtaining an M.B.A. degree as part of Mr. Moore's performance target. Listing it as a performance target may have led to some confusion on Mr. Moore's part. He recognizes that the payments received were wrongful and fraudulent; however, we ask that the Court consider this as a factor at sentencing.

Additionally, as the defense described in the previous section, the relative harm to Siemens is somewhat minor in comparison to their annual net income. As discussed above, this statement is not meant to diminish Mr. Moore's responsibility but to put it in context. It is relevant to consider the damage caused by the conduct and to consider the need for additional punishment. While the defense recognizes that the guidelines recommend a sentence of incarceration, the defense would request that this Court consider alternatives to incarceration or a reduced incarceration sentence. Mr. Moore has not shown any propensity to violence and while on supervision with this Court has incurred no violations, but rather, has maintained steady employment -- a rarity for people in his position.

### 3. The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.

As to the specific deterrence, or the need to protect the public from further crimes, as the defense has noted throughout this memo, Mr. Moore has no criminal history and is very unlikely to reoffend. He recognizes that certain familial financial pressures and professional pressures led to this result. He has realized he cannot take on responsibility for everyone all the time, as he tried to support much of his family previously. The experience of prosecution, the stigma of conviction, and the process of participating in court supervision has and will continue to impress upon Mr. Moore the severity of his actions and deter him from future wrongdoing. Mr.

Moore is remorseful and recognizes that his actions have caused harm. He is committed to trying to change his life in the future.

### 4. The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Mr. Moore does not require any specialized educational or vocational training. He has earned degrees in higher education and has been able to transition into a new field, facility maintenance. Incarceration would serve simply to impede Mr. Moore's attempts to turn his life in a new direction. While incarceration may be warranted from a purely retributive point of view, it makes little sense in this instance from a rehabilitative standpoint. Mr. Moore does suffer from several medical conditions, but defense counsel is not aware of any particularly significant or complicated issues presented by these conditions.

### 5. The guidelines and policy statements issued by the Sentencing Commission and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

The defense has advanced the argument that Mr. Moore should receive a variance or departure from his sentencing guidelines based on everything set forth in this memo. In addition, in Mr. Moore's case, there is a strong argument for a variance in light of other white-collar matters in the Third Circuit. These include the Howe case noted above (18-month downward variance to a probationary sentence on a fraud of approximately $150,000.00) and United States v. Levinson, 543 F.3d 190 (3d Cir. 2008) (24-month downward variance to a probationary sentence on a fraud of approximately $180,000). Unlike Howe, Levinson was remanded for further proceedings by the District Court in light of the lack of a full explanation for

the variance as well as the lower Court's erroneous finding that no financial harm was inflicted on the public.  Nevertheless, both cases provide a window on instances of downward variances in similar white-collar cases. In particular, the frauds in both Howe and Levinson represent a similar amount of loss as in this case, particularly if the Court credits some of Mr. Moore's diversity efforts toward the loss cited in the Indictment and PSR.

6. **The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

As stated above, there is precedent in this Circuit for a sentence of probation on cases with Guidelines similar to Mr. Moore's sentence. A sentence below the Guidelines in this matter, therefore, would not be disparate when considered in comparison with these other sentences. Therefore, this factor would not prevent the Court from imposing a sentence below the Guidelines.

7. **The need to provide restitution to any victims of the offense.**

Mr. Moore recognizes that this Court will order restitution as a part of any sentence and he is prepared to pay restitution in accordance with this Court's order. Although he currently faces a difficult financial situation as the Court can see in the PSR, Mr. Moore has saved some money that he plans to pay toward restitution at sentencing. For all of the foregoing reasons, the defense respectfully requests that his Court vary from the Guidelines in this matter and impose a lower sentence.

Respectfully submitted,

/s/ *Brian M. Collins*
Lawrence S. Krasner, Esq.
Brian M. Collins, Esq.

Attorneys for Owen Moore

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Owen Moore's Sentencing

Memorandum have been served by electronic filing upon the following:


Christopher Diviny, Esq.
Assistant United States Attorney
615 Chestnut Street
Philadelphia, PA 19106

                          _/s/ Brian M. Collins_
                          Lawrence S. Krasner, Esq.
                          Brian M. Collins, Esq.

                          Attorneys for Owen Moore

DATE: September 19, 2014

# EXHIBIT A



**The 2014 CR-V**

With Pandora® Compatibility[1], *Bluetooth®*
HandsFreeLink®[2], SMS texting[3] and more, standard

Shop Now ▶

Important Information

ADVERTISEMENT

 **PayScale** HUMAN CAPITAL

| PERSONAL | BUSINESS | ABOUT | LOGIN |
|---|---|---|---|
| What am I worth? | What should I pay? | Who we are. | |

All ▼          Enter a Job Title, Employer Name, or School Name                    Search

Browse Categories

# Diversity Manager Salary (United States)

A Diversity Manager earns an average salary of $74,199 per year. Most people with this job move on to other positions after 20 years in this field. A skill in Training Program Development is associated with high pay for this job. Pay for this job rises steadily for more experienced workers, but goes down noticeably for employees with more than 20 years' experience.

Like ⟨ 1 ⟩     Share     Tweet     8+1



ASML
For engineers who think ahead

Project Manager
ASML, Wilton, CT

Cleanroom Assembly Technician
Rex Medical, Conshohocken, PA

Information Security Forensic Ana...
SIGNATURE SYSTEMS, Newtown, PA

View more opportunities      Interest based ad

ADVERTISEMENT



|  | 51K | 61K | 74K | 94K | 110K |
|---|---|---|---|---|---|

**MEDIAN: $74,198**

|  | 10% | 25% | 50% | 75% | 90% |

Add this chart to your site: ◈ 640px   ◈ 300px

[+ skill]  [job]

| | National Salary Data (?) | $0 | $50K | $100K | $150K |
|---|---|---|---|---|---|
| Salary | $50,594 - $114,705 | | | | |
| Bonus | $96.96 - $15,591 | | | | |
| Profit Sharing | $1,208 - $10,213 | | | | |
| **Total Pay** (?) | **$50,423 - $120,194** | | | | |

Country: United States | Currency: USD | Updated: 3 Sep 2014 | Individuals Reporting: 230    ⠿ **PayScale**

---

**Is Diversity Manager your job title? Get a personalized salary report!**

| Location: | Years in Field/Career: | Get your salary report » |
|---|---|---|
| | | |

**United States (change)**

**Related Jobs**

Customer Service Manager

Director of Operations

Instructional Designer

Management Consultant

Operations Manager

Program Coordinator, Non-Profit Organization

Program Manager, Non-Profit Organization

Program Project Manager

Project Coordinator, (Unknown Type / General)

Project Manager, (Unspecified Type / General)

**Experience Affects Diversity Manager**

## Job Description for Diversity Manager

- Evaluate the diversity of an organization and provide reports to management.
- Develop, monitor, and enforce diversity policies of an organization.
- Educate employees about diversity issues and how to build an integrated workplace.
- Establish programs and relationships which encourage greater diversity in hiring.

### Diversity Manager Job Listings

**Program Manager, Diversity and Inclusion**                          Aug 24

**Children's Hospital Philadelphia** - Philadelphia, PA

skills The Program Manager, Diversity and Inclusion... Description: The Program Manager, Diversity and Inclusion, is a core member of the Office of Diversity... - *Indeed*

Apply For This Job »

View More Jobs »

jobs by **indeed**

### Search for more jobs:

| job title, skills, or company | city, state or zip | Search |
|---|---|---|
| job title / company | location | |

**Pay by Experience Level for Diversity Manager**

### Salaries

| | |
|---|---|
| Experienced | ▲15% |
| Mid-Career | ▲10% |
| Late-Career | ▲6% |
| **National Average** | **$78,000** |
| Entry-Level | ▼11% |

### Skills That Affect Diversity Manager Salaries

| | |
|---|---|
| Training Program Development | ▲13% |
| Project Management | ▲9% |
| **National Average** | **$78,000** |

### Job Satisfaction

😊😊😊😊😊
Extremely satisfied

Rated 5 out of 5 based on 72 votes.

### Gender



| Female | Male |
|---|---|
| 75% | 25% |

### Years of Experience

| Less than 1 year | 1% |
|---|---|
| 1-4 years | 25% |
| 5-9 years | 33% |
| 10-19 years | 31% |
| 20 years or more | 10% |

### Common Health Benefits



*Median of all compensation (including tips, bonus, and overtime) by years of experience.*



Medical: 94%    Dental: 90%

Vision: 76%    None: 5%

## Pay Difference By Location

| New York | ▲21% | Larger circles over a city indicate a job is popular in that location. |
| Chicago | ▲8% | |
| National Average | $78,000 | |

## Diversity Manager Reviews

*What is it like working as a Diversity Manager?*

### Diversity Manager in Fargo:

#### *"Diversity Work Is Largely Misunderstood."*

**Pros:** Connecting with individuals on everyday issues, which impact our professional and working lives as it relates to issues of diversity and inclusion.

**Cons:** Diversity work is largely misunderstood with most organization working under the premise of compliance and not organizational progress. This work done from a compliance standpoint and typically becomes a numbers game to meet the status quo.

## Related Job Salaries



### Find Out Exactly What You Should Be Paid

**Job Title:**

**Years in Field/Career:**

**Location:**

**United States (change)**

Submit

- OR -

Sign in with **LinkedIn** »

Comp Managers Click Here »

PayScale

page



| | | | | | | |
|---|---|---|---|---|---|---|
| **Customer Service Manager** (6430 salaries) | | | | | | |
| **Director of Operations** (9797 salaries) | | | | | | |
| **Instructional Designer** (1850 salaries) | | | | | | |
| **Management Consultant** (3744 salaries) | | | | | | |
| **Operations Manager** (25727 salaries) | | | | | | |
| **Program Coordinator, Non-Profit Organization** (6809 salaries) | | | | | | |
| **Program Manager, Non-Profit Organization** (4729 salaries) | | | | | | |
| **Program Project Manager** (4862 salaries) | | | | | | |
| **Project Coordinator, (Unknown Type / General)** (6599 salaries) | | | | | | |
| **Project Manager, (Unspecified Type / General)** (5859 salaries) | | | | | | |
| $0K | $20K | $40K | $60K | $80K | $100K | $120K |



YOUR SALARY
Find out what you are worth with a free Salary Report!

**Take Survey**

**BUSINESS**
Compensation Software
Whitepapers
Webinars
Customers
Support
Request a Demo

**PERSONAL**
Get Your Salary Report
Find a Job
Research Careers
College Salary Report

**SCHOOLS**
Alumni Analytics

**PRESS**
Press Releases
PayScale in the News
Partners
Advertise with us!

**BLOGS**
Career News
Compensation Today

**JOBS**
Hiring in Seattle, WA

**CONTACT**
PayScale, Inc.
542 1st Ave. S.
Suite 400
Seattle, WA 98104



**ABOUT**
About PayScale
Our Culture
Benefits
Management Team
Board of Directors
Board of Advisors
Methodology

⋆ Privacy Notice: PayScale takes your privacy seriously and is sensitive to the nature of information collected on this site.

Terms of Use | Privacy Policy
© 2014 PayScale, Inc. All rights reserved

Back to Top

# EXHIBIT B

## RECONCILIATION TO ADJUSTED EBITDA (continuing operations)

The following table gives additional information on topics included in Profit and Income before income taxes and provides a reconciliation to adjusted EBITDA. We report adjusted EBIT and adjusted EBITDA as a performance measure. The closest comparable GAAP figure under IFRS is Net income as reported in our "Consolidated Statements of Income."
For further information regarding adjusted EBIT and adjusted EBITDA, please refer to the end of this Combined management report.

For the fiscal years ended September 30, 2010 and 2009

| (in millions of €) | Profit[1] | | Income (loss) from investments accounted for using the equity method, net[2] | |
|---|---|---|---|---|
| | 2010 | 2009 | 2010 | 2009 |
| **Sectors and Divisions** | | | | |
| **Industry Sector** | 3,478 | 2,701 | 5 | 1 |
| Industry Automation | 1,048 | 681 | (2) | (2) |
| Drive Technologies | 855 | 836 | (1) | (2) |
| Building Technologies | 456 | 340 | 7 | 4 |
| OSRAM | 569 | 89 | (8) | (2) |
| Industry Solutions | 39 | 360 | 4 | 4 |
| Mobility | 513 | 390 | 5 | (1) |
| **Energy Sector** | 3,562 | 3,315 | 78 | 59 |
| sil Power Generation | 1,516 | 1,275 | 27 | 26 |
| Renewable Energy | 368 | 382 | 9 | 4 |
| Oil & Gas | 487 | 499 | – | – |
| Power Transmission | 763 | 725 | 36 | 27 |
| Power Distribution | 422 | 435 | 6 | 2 |
| **Healthcare Sector** | 748 | 1,450 | 3 | 29 |
| Imaging & IT | 1,452 | 1,161 | 7 | 8 |
| Workflow & Solutions | 27 | (53) | – | 10 |
| Diagnostics | (776) | 338 | (9) | – |
| **Total Sectors** | 7,789 | 7,466 | 86 | 89 |
| **Equity Investments** | (191) | (1,851) | (248) | (2,160) |
| **Cross-Sector Businesses** | | | | |
| **Siemens IT Solutions and Services** | (537) | 90 | 20 | 26 |
| **Siemens Financial Services (SFS)** | 447 | 304 | 83 | 130 |
| **Reconciliation to Consolidated Financial Statements** | | | | |
| Centrally managed portfolio activities | (139) | (371) | – | – |
| Siemens Real Estate (SRE) | 250 | 341 | – | – |
| Corporate items and pensions | (1,479) | (1,715) | – | (4) |
| Eliminations, Corporate Treasury and other reconciling items | (328) | (373) | 20 | (27) |
| **Siemens** | 5,811 | 3,891 | (40) | (1,946) |

1  Profit of the Sectors and Divisions as well as of Equity Investments, Siemens IT Solutions and Services and Centrally managed portfolio activities is earnings before financing interest, certain pension costs and income taxes. Certain other items not considered performance indicative by Management may be excluded. Profit of SFS and SRE is Income before income taxes. Profit of Siemens is Income from continuing operations before income taxes. For a reconciliation of Income from continuing operations before income taxes to Net income see Consolidated Statements of Income.
2  Includes impairments and reversals of impairments of investments accounted for using the equity method.
3  Includes impairment of non-current available-for-sale financial assets. For Siemens, Financial income (expense), net comprises Interest income, Interest expense and Other financial income (expense), net as reported in the Consolidated Statements of Income.

6   To our shareholders                    21   Corporate Governance                    49   Combined management's discussion and analysis

50   Business and operating environment
78   Fiscal 2010 – Financial summary
81   Results of operations
98   Financial position
110   Net assets position
113   Overall assessment of the economic position

# EXHIBIT C

 **IRS**

**Small Business/Self-Employed**

- Industries/Professions
- International Taxpayers
- Self-Employed
- **Small Business/Self-Employed Home**

**Other International Individual Topics**

- Alien Taxation - Certain Essential Concepts
- Classification of Taxpayers for U.S. Tax Purposes
- Determining Alien Tax Status
- Employees of Foreign Governments or International Organizations
- Income from Abroad is Taxable
- New Developments in International Taxation
- Special Categories of Alien Workers
- Taxation of Dual-Status Aliens
- Taxation of Foreign Athletes and Entertainers
- Taxation of Aliens by VISA Type and Immigration Status
- Tax Withholding on Foreign Persons
- Miscellaneous International Tax Issues

# Yearly Average Currency Exchange Rates
## Translating foreign currency into U.S. dollars

You must express the amounts you report on your U.S. tax return in U.S. dollars. Therefore, you must translate foreign currency into U.S. dollars if you receive income or pay expenses in a foreign currency. The only exception relates to some qualified business units (QBUs), which are generally allowed to use the currency of a foreign country.

**Note:** Payments of U.S. tax must be remitted to the U.S. Internal Revenue Service (IRS) in U.S. dollars.

## Currency exchange rates

The Internal Revenue Service has no official exchange rate. Generally, it accepts any posted exchange rate that is used consistently.

When valuing currency of a foreign country that uses multiple exchange rates, use the rate that applies to your specific facts and circumstances. For example, if you have a single transaction such as the sale of a business that occurred on a single day, use the exchange rate for that day. However, if you receive income evenly throughout the tax year, you may translate the foreign currency to U.S. dollars using the yearly average currency exchange rate for the tax year.

**Note:** The exchange rates referenced on this page do **not** apply when making payments of U.S. taxes to the IRS.  If the IRS receives U.S. tax payments in a foreign currency, the exchange rate used by the IRS to convert the foreign currency into U.S. dollars is based on the date the foreign currency is converted to U.S. dollars by the bank processing the payment, not the date the foreign currency payment is received by the IRS.

## Yearly average currency exchange rates

For additional exchange rates, refer to Foreign Currency and Currency Exchange Rates.

To convert from foreign currency to U.S. dollars, divide the foreign currency amount by the applicable yearly average exchange rate in the table below. To convert from U.S. dollars to foreign currency, multiply the U.S. dollar amount by the applicable yearly average exchange rate in the table below.

**Yearly Average Exchange Rates for Converting Foreign Currencies into U.S. Dollars**

| Country | Currency | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 |
|---------|----------|------|------|------|------|------|------|
| **Afghanistan** | Afghani | 57.822 | 53.130 | 48.817 | 48.409 | 53.040 | 50.417 |
| **Algeria** | Dinar | 83.339 | 81.301 | 76.525 | 78.471 | 77.110 | 68.437 |
| **Argentina** | Peso | 5.704 | 4.738 | 4.299 | 4.077 | 3.888 | 3.298 |
| **Australia** | Dollar | 1.078 | 1.005 | 1.008 | 1.134 | 1.332 | 1.245 |
| **Bahrain** | Dinar | 0.395 | 0.395 | 0.394 | 0.394 | 0.394 | 0.394 |

| Brazil | Real | 2.249 | 2.035 | 1.742 | 1.838 | 2.008 | 1.914 |
|---|---|---|---|---|---|---|---|
| Canada | Dollar | 1.071 | 1.040 | 1.029 | 1.072 | 1.187 | 1.109 |
| Cayman Islands | Dollar | 0.873 | 0.872 | 0.868 | 0.868 | 0.856 | 0.867 |
| China | Yuan | 6.446 | 6.573 | 6.732 | 7.050 | 7.115 | 7.241 |
| Denmark | Krone | 5.843 | 6.025 | 5.571 | 5.847 | 5.570 | 5.299 |
| Egypt | Pound | 7.185 | 6.348 | 6.211 | 5.908 | 5.825 | 5.715 |
| Euro Zone | Euro | 0.783 | 0.809 | 0.748 | 0.785 | 0.748 | 0.711 |
| Hong Kong | Dollar | 8.067 | 8.068 | 8.096 | 8.080 | 8.062 | 8.091 |
| Hungary | Forint | 232.771 | 234.421 | 209.338 | 216.583 | 210.463 | 179.603 |
| Iceland | Krona | 127.323 | 130.282 | 120.906 | 129.851 | 130.043 | 92.133 |
| India | Rupee | 60.936 | 55.911 | 49.124 | 47.774 | 50.804 | 45.567 |
| Iraq | Dinar | 1225.266 | 1224.581 | 1230.715 | 1230.020 | 1228.033 | 1262.118 |
| Israel | New Shekel | 3.759 | 4.014 | 3.724 | 3.887 | 4.089 | 3.735 |
| Japan | Yen | 101.517 | 83.008 | 82.931 | 91.342 | 97.361 | 107.605 |
| Lebanon | Pound | 1589.155 | 1583.096 | 1581.575 | 1579.773 | 1585.339 | 1587.847 |
| Mexico | Peso | 13.275 | 13.695 | 12.943 | 13.151 | 14.058 | 11.612 |
| Morocco | Dirham | 8.829 | 9.064 | 8.478 | 8.829 | 8.474 | 8.115 |
| New Zealand | Dollar | 1.270 | 1.285 | 1.316 | 1.444 | 1.663 | 1.482 |
| Norway | Kroner | 6.117 | 6.056 | 5.835 | 6.291 | 6.550 | 5.873 |
| Qatar | Rial | 3.796 | 3.798 | 3.791 | 3.793 | 3.792 | 3.794 |
| Russia | Rouble | 33.165 | 32.407 | 30.626 | 31.651 | 33.088 | 25.865 |
| Saudi Arabia | Riyal | 3.901 | 3.902 | 3.902 | 3.906 | 3.904 | 3.907 |
| Singapore | Dollar | 1.302 | 1.300 | 1.308 | 1.418 | 1.513 | 1.472 |
| South Africa | Rand | 10.037 | 8.553 | 7.562 | 7.638 | 8.782 | 8.606 |
| South Korean | Won | 1142.933 | 1175.380 | 1153.728 | 1206.268 | 1330.240 | 1146.949 |
| Sweden | Krona | 6.780 | 7.048 | 6.755 | 7.498 | 7.958 | 6.857 |
| Switzerland | Franc | 0.964 | 0.976 | 0.923 | 1.085 | 1.129 | 1.126 |
| Taiwan | Dollar | 30.945 | 30.849 | 30.693 | 32.814 | 34.389 | 32.818 |
| Thailand | Baht | 32.027 | 32.456 | 31.893 | 33.227 | 35.953 | 34.603 |
| Tunisia | Dinar | 1.695 | 1.629 | 1.469 | 1.502 | 1.410 | 1.299 |
| Turkey | New Lira | 1.982 | 1.874 | 1.748 | 1.569 | 1.619 | 1.358 |
| United Arab Emirates | Dirham | 3.821 | 3.821 | 3.821 | 3.821 | 3.821 | 3.821 |
| United | Pound | 0.665 | 0.656 | 0.649 | 0.673 | 0.667 | 0.567 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Kingdom** | | | | | | | |
| **Venezuela** | Bolivar (Fuerte) | 6.312 | 4.473 | 4.474 | 4.384 | 2.238 | 2.239 |

## References/Related Topics

- Foreign Currency and Currency Exchange Rates
- Miscellaneous International Tax Issues

*Page Last Reviewed or Updated: 15-Jan-2014*